UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

DEBBIE A. DUNCAN,

                Plaintiff,              NOT FOR PUBLICATION

   -against-                     **MEMORANDUM & ORDER**

MICHAEL J. ASTRUE,            09-CV-4462 (KAM)
As COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

--------------------------------------- X
**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C. § 405(g), plaintiff, Debbie A.
Duncan ("plaintiff"), appeals the final decision of defendant
Michael Astrue, Commissioner of Social Security ("defendant"),
which denied plaintiff's application for Social Security
Disability ("SSD") and Supplemental Security Income ("SSI")
under Title II and Title XVI, respectively, of the Social
Security Act ("the Act").  Plaintiff contends that she is
disabled within the meaning of the Act and is thus entitled to
receive the aforementioned benefits.  Presently before the court
is defendant's motion for judgment on the pleadings.  For the
reasons stated below, defendant's motion is denied and remanded
for further proceedings consistent with this opinion.

## A.    Procedural History

Plaintiff applied for SSD and SSI on July 14, 2004, contending that she had been disabled since June 10, 2001.  (Tr.[1] 47, 120, 123-24.)  Plaintiff alleged that she was disabled due to venous insufficiency[2] and back problems.  (Tr. 123-24.)  She also claimed that her legs were swollen and that she experienced numbness extending to her right foot to the point that she could barely walk.  (*Id.*)  The Social Security Administration ("SSA") denied her application on November 15, 2004.  (Tr. 54-58.)

After having her application denied by the SSA, plaintiff requested a hearing before an Administrative Law Judge.  (Tr. 63.)  The request for a hearing was granted and a hearing was held on September 25, 2006 before ALJ David Z. Nisnewitz (the "ALJ").  (Tr. 411-48.)  By a decision dated January 23, 2007, the ALJ found that plaintiff was not disabled (the "first decision" or the "January 23, 2007 decision").  (Tr. 44-53.)

Plaintiff appealed the ALJ's decision to the Appeals Council on May 30, 2007. (Tr. 67-72.)  On October 18, 2007, the Appeals Council vacated the ALJ's decision and remanded

---

[1]  "Tr." refers to the certified administrative record (Tr. 1-448).
[2]  "Venous insufficiency" refers to inadequate drainage of venous blood from a part, resulting in edema (an accumulation of an excessive amount of watery fluid in cells or intercellular tissues) or dermatosis (nonspecific term used to denote any cutaneous abnormality or eruption).  *See Stedman's Medical Dictionary* 107970, 124770, 205100 (27th ed. 2000) ("Stedman's").

plaintiff's case back to the ALJ for additional development and further assessment of the treating source opinions. (Tr. 73-77.) The Appeals Council directed that, on remand, the ALJ should: (1) update the record with additional evidence concerning plaintiff's impairments from plaintiff's treating and examining sources, especially progress reports from Dr. Schwartz, give further consideration to the treating and examining source opinions and non-examining source opinions pursuant to 20 C.F.R. §§ 404.1527 and 416.927, Social Security Rulings ("SSR") 96-2p and 96-5, and explain the weight given to the opinion evidence; (2) as appropriate, request treating and examining sources to provide additional evidence and/or further clarification of their opinions and medical source statements about what plaintiff can still do despite her impairments (20 C.F.R. §§ 404.1512 and 416.912); (3) if necessary, obtain evidence from medical experts, preferably a board certified orthopedist and a rheumatologist, to clarify and comment on the longitudinal history, nature, and severity of plaintiff's impairments, and obtain an opinion as to plaintiff's work-related limitations or restrictions resulting from her impairments; (4) further "evaluate [plaintiff's] subjective complaints and provide rationale" in accordance with 20 C.F.R. §§ 404.1529 and 416.929, pertinent circuit case law, and SSR 96-7p; and (5) if warranted by the expanded record, obtain evidence

from a vocational expert to clarify the effect of plaintiff's assessed limitations on her occupational base pursuant to SSR 83-14. (Tr. 76.)

Pursuant to the Appeals Council's decision, the ALJ held a supplemental hearing on June 10, 2008. (Tr. 359-410.) The hearing only addressed plaintiff's SSI application. (Tr. 366.) During the hearing, the ALJ granted plaintiff's amendment of her disability onset date from June 10, 2001 to July, 2003.[3] (Tr. 367.) On November 26, 2008, however, the ALJ again decided that plaintiff was not disabled. (Tr. 21-31.) Specifically, the ALJ found that plaintiff's "allegations [were] disproportionate to the record," and that she had the Residual Functional Capacity ("RFC")[4] to perform a full range of sedentary work.[5] (Tr. 28, 30.) The ALJ concluded that plaintiff was able

---

[3] Plaintiff applied for SSI benefits on July 14, 2004. (Tr. 123-24.) Plaintiff amended her onset date from June 10, 2001 to July 2003 because she only had medical records beginning from April, 2003 (Tr. 366-67) and because SSI benefits are generally not payable for any month prior to the month the application was filed. *See* 42 U.S.C. § 1382(c)(7).

[4] "Residual Functional Capacity" is what a person is still capable of doing despite limitations resulting from physical and mental impairments. 20 C.F.R. § 416.945(a).

[5] "Sedentary work is the least rigorous of the five categories of work recognized by the SSA regulations." *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998) (citing 20 C.F.R. § 404, Subpt. P, App. 2). It "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Rosa v. Callahan*, 168 F.3d 72, 78 n.3 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (internal quotation marks omitted)). It also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

to perform her past work as a receptionist as the job is actually and generally performed.  (Tr. 31.)

Plaintiff appealed the ALJ's November 26, 2008 decision to the Appeals Council on January 4, 2009 alleging: (1) that the ALJ failed to follow the treating physician rule pursuant to 20 C.F.R. §§ 404.1527(d) and 416.927(d); (2) that the ALJ erred by rejecting the opinions of plaintiff's treating physicians; (3) that the ALJ failed to recontact plaintiff's treating physicians pursuant to 20 C.F.R. §§ 404.1515(e) and 416.912(e); and (4) that the ALJ failed to support his assessment of plaintiff's RFC.  (Tr. 14-19.)

The Appeals Council granted plaintiff's request for review and found an error of law in the ALJ's failure to adjudicate plaintiff's SSD claim.  (Tr. 114-15; *see also* Tr. 9.) Upon considering the written record that was before the ALJ and the testimony at the hearing, the Appeals Council, on April 24, 2009, reviewed the ALJ's findings and conclusions made in connection with plaintiff's SSI claim and applied them to her SSD claim.[6]  (Tr. 115.)  The Appeals Council found plaintiff not

---

[6]  The Appeals Council explained its decision to adjudicate plaintiff's SSD claim based on the ALJ's adjudication of plaintiff's SSI claim:

> In citing the Social Security Administration authority for evaluating the claim, the hearing decision references applying the applicable law under the authority of 20 C.F.R. 404.1520(a) and 416.920(a) as well as citing references to both laws at the appropriate steps in the sequential evaluation.  However, the hearing did not expressly adjudicate the claim for a period of disability and disability insurance benefits and only included a decisional paragraph for the

disabled, affirmed the denial of her SSI claim, and denied her SSD claim. (*Id.*)

On May 22, 2009, plaintiff requested to amend her alleged onset date from June 10, 2001 to April 15, 2003, and for the Appeals Council to find her disabled as of April 15, 2003 because April 15, 2003 is the day when her symptoms were first documented by Dr. Lionel E. Desroches, plaintiff's primary treating physician. (Tr. 15, 160-61.) The Appeals Council denied plaintiff's requests on August 25, 2009, stating that the final decision of the Commissioner of Social Security was to adopt the ALJ's statements regarding the pertinent law, issues, and evidentiary facts, as well as the ALJ's findings or conclusions regarding whether plaintiff is disabled. (Tr. 5-11.) This appeal followed.

## B. Non-Medical Facts

Plaintiff was born on October 19, 1962, and was forty-five years old at the time of her supplemental hearing with the ALJ on June 10, 2008. (Tr. 367.) Her highest level of education is the eleventh grade. (Tr. 127.) In 2003, she took classes to obtain a graduate equivalency diploma ("GED"), but did not pass the required examination. (Tr. 377-78.)

claim for supplemental security income. Therefore, the Appeals Council adopts all of the hearing decision's findings and conclusions made in connection with the title 16 claim and applies them to the title 2 claim and finds the claimant 'not disabled' for both claims.

(Tr. 115; *see also* Tr. 9.)

Plaintiff's recent work experience includes positions as a computer operator, department store sales representative, clerical file clerk, and law firm receptionist. (Tr. 370-74.) She earned between seven and ten dollars per hour at these jobs and worked full-time. (Tr. 137-42.)

As a sales representative, she sustained back and shoulder injuries after falling from a stool while trying to retrieve a box of files. (Tr. 185, 372-73.) She received workers' compensation for the injury from January 29, 2001 to March 9, 2001. (Tr. 373.)

Plaintiff most recently worked as a law firm receptionist. (Tr. 370-71.) She reported that the job entailed walking for two hours a day, standing for two hours a day, and sitting for eight hours a day. (Tr. 124-25.) The job did not require her to lift more than five pounds. (Tr. 421.) She worked at the job for six months in 2001. (Tr. 370.)

Plaintiff was laid off from her law firm receptionist position in December 2001. She reported that she did not look for work after that time because she began to feel "sick" and wanted to go back to school. (Tr. 371, 422.) She resumed looking for work in 2003, but was unsuccessful. (Tr. 433-34.) She has not looked for work since 2003. (*Id.*)

Plaintiff now receives public assistance and lives with her parents, brother, and eighteen-year-old daughter. (Tr.

369, 384.)  She is married but is separated from her husband.
(Tr. 368.)  She reports that her household chores are limited to
light dusting and sweeping, as well as cooking while sitting
down with her legs elevated.  (Tr. 147, 384-85.)  Her daughter
helps her cook, does her laundry, and cleans her bathroom.  (Tr.
384-85.)  Her daughter also helps her with grooming, dressing,
and showering.  (Tr. 147, 238.)  Plaintiff reportedly cannot get
dressed by herself.  (Tr. 447.)  Plaintiff's brother assists her
by driving her places and taking her shopping.  (Tr. 369, 384.)
Plaintiff goes shopping once a month and only goes outside of
her home twice a week, though never alone.  (Tr. 148, 238, 447.)
She also reports using public transportation.  (Tr. 369.)  With
regard to her daily activities, plaintiff describes that she
socializes with her young nephews, watches television, and reads
newspapers.  (Tr. 385, 439-40.)

     At her September 25, 2006 hearing, plaintiff testified
that she can only walk half of a block before she has to stop
and rest.  (Tr. 444.)  She also testified that she can only sit
for fifteen to twenty minutes before her back starts hurting her
to the point where she has to get up and move around.  (*Id.*)
When asked what she does all day, she replied, "pretty much just
sit back and try to hold my legs up because my feet hurt me so
much.  I can't even stand on them too long."  (Tr. 429.)

**C.    Medical Facts**

Plaintiff has presented medical records dating back to April 2003.  (Tr. 367.)  Her date-last-insured was September 30, 2003.  (Tr. 156.)  The discussion below addresses plaintiff's testimony regarding her symptoms as well as the medical evidence and opinions in the record.

**1.    Plaintiff's Testimony Regarding Her Symptoms**

At plaintiff's September 25, 2006 hearing, plaintiff testified that she had swelling and pain in her neck, back, armpits, hands, feet, and ankles, as well as stiffness in her shoulders.  (Tr. 418, 434, 445-46.)  She further testified that she experiences pain every day and it feels like "needles and pins sticking [her]."  (Tr. 435, 443.)  According to her testimony, her pain makes walking and balancing difficult, and makes her unable to turn her head.  (Tr. 444, 446.)

At plaintiff's June 10, 2008 hearing, she testified that she experiences swelling in her hands and legs and pain in her back.  (Tr. 375, 380.)  She also claimed to experience numbness in her legs to the effect that, when walking, she "can't even lift [her] foot up."  (Tr. 380.)

## 2.   Treating Sources[7]

### a.   Dr. Julius W. Garvey

Dr. Julius W. Garvey is a vascular surgeon who began treating plaintiff on May 15, 2004. (*See* Tr. 173.)  His treatment notes regarding plaintiff span two months from May 15, 2004 to August 16, 2004. (*See* Tr. 173-78.)  In examining plaintiff on May 15, 2004, Dr. Garvey documented that plaintiff had varicose veins in both of her legs and had been experiencing progressively worse symptoms since 2003. (Tr. 173.)  He also reported that nothing reduced plaintiff's symptomology and that she took pain medication for her neck and back. (*Id.*) Additionally, he noted that she had pain, swelling, numbness, and some discoloration in her legs. (Tr. 175.)  To treat plaintiff's symptoms, Dr. Garvey prescribed support stockings and recommended that plaintiff elevate her feet and exercise to lose weight. (*Id.*)  He also ordered that plaintiff undergo Doppler testing for her right leg pain and numbness in her toes. (Tr. 175, 180.)  The test, conducted on June 1, 2004, showed mild left peripheral vascular disease.[8] (Tr. 180.)  Also on June

---

[7]  A "treating source" includes a claimant's "own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1502, 416.902.
[8]  "Peripheral Vascular Disease" ("P.V.D.") refers to a common circulatory problem entailing blocked, narrowed, or weakened arteries.  Symptoms range from pain, cold feet, and bluish discoloration to stroke or gangrene.  If P.V.D. is not reversed, the body part affected is injured and eventually starts to die. eMedicineHealth, *Peripheral Vascular Disease* (2005), *available at*

1, 2004, Dr. Garvey conducted a Bilateral Duplex Study of the
Lower Extremity Venous System on plaintiff from which he found
evidence of venous insufficiency.  (Tr. 181.)

Dr. Garvey performed a VNUS Closure procedure[9] on
plaintiff's right leg in July 2004 and her left leg in February
2005.  (Tr. 177, 256, 379-80, 427.)  On August 2, 2004, after
the first surgery, Dr. Garvey preformed a right duplex study of
plaintiff's lower extremity venous system, finding normal post
VNUS examination with thrombosed right greater saphenous vein.
(Tr. 179.)

After the surgeries, plaintiff claims that her legs
remained swollen and that she experienced numbness that never
dissipated.  (Tr. 380.)  She claims that the numbness occurs
two-to-three times a week, lasting "a good hour" and making her
feel like she cannot lift her feet up when walking.  (Tr. 380-
81.)

---

http://www.emedicinehealth.com/peripheral_vascular_disease/article_em.htm
(last visited May 6, 2011).
[9]  VNUS Closure procedure is a type of varicose vein surgery, whereby
physicians "close the diseased veins by inserting the Closure catheter into a
vein and heating the vein wall using temperature-controlled RF energy.
Heating the vein wall causes collagen in the wall to shrink and the vein to
close.  After the vein is sealed shut, blood then naturally reroutes to
healthy veins."  VNUS Closure™ Procedure *available at*
http://www.vnus.com/patient-info/closure-procedure.aspx) (last visited May 6,
2011).  The procedure is a "minimally invasive treatment alternative with
less pain and less bruising when compared to traditional vein stripping
surgery and laser treatment."  *Id.*

### b. Dr. Lionel E. Desroches

Dr. Lionel E. Desroches has been plaintiff's primary treating physician since April 15, 2003. (Tr. 15.) In a letter dated July 13, 2004, Dr. Desroches wrote that plaintiff suffered from severe pain in both legs and had no feeling in the lower part of her legs. (Tr. 352.) He also documented that Dr. Garvey found plaintiff to suffer from venous insufficiency and was requesting surgery. (*Id.*) Dr. Desroches further stated in his July 13, 2004 letter that "[plaintiff] cannot work at this time." (*Id.*)

In a letter dated July 23, 2004, Dr. Desroches called plaintiff's venous insufficiency "severe" and stated that the condition was causing swelling in her legs and an inability to ambulate. (Tr. 353.) He concluded that she was "disabled until further notice." (*Id.*)

In a letter dated August 5, 2004, Dr. Desroches reported that plaintiff suffered from severe back pain due to osteoarthritis[10] of the back. (Tr. 200, 351.) He further wrote that plaintiff had difficulty ambulating and getting up from a seated position. (*Id.*) To alleviate her pain, Dr. Desroches wrote that plaintiff took multiple anti-inflammatory agents, but

---

[10] "Osteoarthritis" refers to "arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints, is more common in older persons." Stedman's at 288490.

at the time had experienced no improvement. (*Id.*)
Additionally, he reported that plaintiff still suffered from
venous insufficiency despite her surgery, with swelling of the
lower extremities upon standing. (*Id.*)

In a medical assessment form sent from the Division of
Disability Determinations at the New York State Office of
Temporary and Disability Assistance, dated September 7, 2004,
Dr. Desroches largely repeated his previous assessments. (Tr.
188-96.) Dr. Desroches noted plaintiff's diagnoses of venous
insufficiency and back pain and explained that, with respect to
her chronic venous insufficiency, plaintiff had edema and pain,
but no ulcerations. (Tr. 189, 192-93.) He stated that
plaintiff had decreased reflexes in her lower extremities, back
pain radiating to both legs, and that her "severe body pain"
limited her ability to walk or sit for long periods of time.
(Tr. 188, 192.) He also noted that her x-rays showed evidence
of a degenerative disease, though he did not specify what x-rays
he was referring to. (Tr. 188.) Moreover, he opined that she
was limited to lifting a maximum of five pounds and limited in
her ability to push and/or pull and to stand and/or walk. (Tr.
194-95.) He also indicated on the form stating that plaintiff
could only sit for fewer than six hours per day. (*Id.*)
Finally, Dr. Desroches noted that plaintiff's current treatment
consisted of Motrin, as needed, and that she did not have

significant abnormality in gait or require an assistive walking device.  (Tr. 190, 194.)

In a letter dated January 27, 2006, the most recent document in the record from Dr. Desroches, the doctor indicated that plaintiff's symptoms remained unchanged.  (Tr. 213.)  He wrote that she suffered from low back pain due to osteoarthritis of the back, had difficulty getting up from a seated position, suffered from venous insufficiency, and had difficulty ambulating.  (*Id.*)  He also wrote that she had recently been diagnosed with rheumatoid arthritis of the lower extremities.  (*Id.*)  He concluded that plaintiff was "completely disabled."  (*Id.*)

### c.   Dr. David Zelefsky

Dr. David Zelefsky, M.D., is a Pain Management and Rehabilitation specialist and another one of plaintiff's treating physicians.  (Tr. 16, 266-69.)  He saw and evaluated plaintiff approximately once a month from January 2007 to at least April 2008.  (Tr. 266-348.)

On January 16, 2007, Dr. Zelefsky examined plaintiff for complaints of neck pain radiating to her right shoulder, pain down her right arm coupled with numbness of both hands, low back pain, numbness of both feet, and pain radiating to her bilateral lower extremities.  (Tr. 266.)  He found her to be limited in housecleaning, shopping, lifting, and bending;

14

"prolonged limited" in walking, standing, and sitting; and as needing occasional help from her daughter when dressing. (Tr. 267.) Cervical compression and distraction tests came back negative, but he found cervical, thoracic, and lumbar paraspinal tenderness and spasms. (*Id.*) He also found a limited range of motion in her cervical and lumbar examinations. (*Id.*)

With regard to plaintiff's hands, Dr. Zelefsky found a full range of motion, tenderness in the joints, negative swelling, warmth, and erythema. (*Id.*) With regard to motor strength, he indicated 5/5 in her left upper extremities except for her left APB[11] and intrinsics, which he indicated 4/5. (Tr. 268.) He further indicated 4/5 for her right upper and lower extremities, and 5/5 for her left lower extremities. (*Id.*)

Dr. Zelefsky's diagnoses were cervical radiculopathy,[12] lumbrosacral radiculopathy,[13] rule out bilateral carpal tunnel

---

[11] "APB" refers to the abductor pollicis brevis, a muscle in the hand that abducts the thumb. *See* Thomas R. Gest & Jane Schlesinger, *Anatomy Tables – Hand* (1995), *available at* http://anatomy.med.umich.edu/musculoskeletal_system/hand_tables.html (last visited May 6, 2011).

[12] "Cervical radiculopathy" is "the damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed. Damage to nerve roots in the cervical area can cause pain and the loss of sensation in various upper extremities, depending on where the damaged roots are located." WebMD, *Pain Management: Cervical Radiculopathy* (2006), *available at* http://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited May 6, 2011).

[13] "Lumbar radiculopathy" refers to "nerve irritation caused by damage to the discs between the vertebrae. Damage to the disc occurs because of degeneration ('wear and tear') of the outer ring of the disc, traumatic injury, or both. As a result, the central softer portion of the disc can rupture (herniate) through the outer ring of the disc and abut the spinal cord or its nerves as they exit the bony spinal column. This rupture is what causes the commonly recognized pain of 'sciatica' that shoots down the leg."

syndrome, S.L.E./arthritis, cervical, thoracic and lumbosacral myofasitis.[14]  (Tr. 268.)  He recommended that plaintiff undergo testing, physical therapy for four weeks, begin a trial of Celebrex, and discontinue taking Advil or aspirin.  (Tr. 268-69.)  Plaintiff was to return in four weeks.  (Tr. 172.)

On February 20, 2007, plaintiff returned to Dr. Zelefsky for a re-evaluation.  (Tr. 270.)  Plaintiff had not yet started physical therapy or the trial of Celebrex.  (*Id.*)  Dr. Zelefsky's findings were the same as those on January 16, 2007, except that the cervical compression test was positive, motor strength was 4/5 in plaintiff's arms and legs, and there was a decreased sensitivity in the right C-8 and L4-5 and S-1 dermatomes.  (Tr. 271.)  Dr. Zelefsky recommended that plaintiff undergo an MRI of the cervical and lumbar spine and other diagnostic tests.  (Tr. 272.)  He again recommended that plaintiff start physical therapy.  (Tr. 271-72.)  On February 22, 2007, Dr. Zelefsky conducted Nerve Conduction Velocity ("NCV") and Electromyography ("EMG") tests of plaintiff's upper and lower extremities.  (Tr. 342-48.)  His impressions were that the NCV findings were consistent with right, distal, median

---

MedicineNet, *Definition of Lumbar radiculopathy* (2004), *available at* http://www.medterms.com/script/main/art.asp?articlekey=26093 (last visited May 6, 2011).
[14]  "Myofascitis" refers to "inflammation of a muscle and/or the fascia which covers it.  Also, inflammation of the fascia by which some muscles are attached to bone."  *See* J.E. Schmidt, *Attorneys' Dictionary of Medicine* M-14378 (43rd ed. 2009) ("Attorneys' Dictionary of Medicine").

sensory neuropathy as seen in carpal tunnel syndrome,[15] and that

the EMG evaluation failed to reveal evidence of radiculopathy in

the muscles evaluated.  (Tr. 345.)

On March 26, 2007, plaintiff had an MRI of her

cervical spine, and a report was sent to Dr. Zelefsky.  (Tr.

324, repeated at Tr. 325.)  The MRI found degenerative change

manifested by disc desiccation and a C3-C4 disc bulge, which

indented the ventral aspect of the thecal sac, straightening of

the normal cervical lordosis that may be secondary to muscle

spasm.  (*Id.*)

Plaintiff saw Dr. Zelefsky again on April 24, June 5,

and August 9, 2007.  He diagnosed plaintiff with cervical

radiculopathy with disc bulges, lumbrosacrol radiculopathy,

bilateral carpal tunnel syndrome, lupus,[16] arthritis, cervical,

thoracic, and lumbosacral myofascitis and fibroids on June 5,

and August 9, 2007.  (Tr. 283-84, 289.)

Dr. Zelefsky completed a Medical Impairment Evaluation

and Questionnaire as to RFC dated May 15, 2007.  (Tr. 232.)  In

---

[15]  "Bound by bones and ligaments, the carpal tunnel is a narrow passageway —
about as big around as your thumb — located on the palm side of your wrist.
This tunnel protects a main nerve to your hand and nine tendons that bend
your fingers.  Pressure placed on the nerve produces the numbness, pain and,
eventually, hand weakness that characterize carpal tunnel syndrome."  *See*
Mayo Clinic, *Carpal tunnel syndrome* (2009), *available at*
http://www.mayoclinic.com/health/carpal-tunnel-syndrome/DS00326 (last visited
May 6, 2011).
[16]  Lupus is "a chronic inflammatory disease that occurs when your body's
immune system attacks your own tissues and organs.  Inflammation caused by
lupus can affect many different body systems, including your joints, skin,
kidneys, blood cells, heart and lungs."  Mayo Clinic, *Lupus* (2009), *available
at* http://www.mayoclinic.com/health/lupus/DS00115 (last visited May 6, 2011).

the questionnaire, he listed plaintiff's symptoms as neck and back pain, pain in the legs, numbness in the hands and feet, and bilateral hand pain. (*Id.*) He also noted cervical, thoracic, and lumbosacral paraspinal tenderness and spasms, pain and tenderness in both of plaintiff's hands, decreased range of motion of her neck and back, motor weakness of both bilateral upper extremities and bilateral lower extremities, and no Achilles reflexes bilaterally. (Tr. 233.) He affirmed that plaintiff's impairments have lasted or can be expected to last at least twelve months. (Tr. 234.) Dr. Zelefsky noted that the March 26, 2007 MRI of plaintiff's cervical spine revealed a disc bulge at C3-C4 and degenerative changes. (Tr. 233; *see also* Tr. 324, repeated at 325.)

Dr. Zelefsky again diagnosed plaintiff with cervical and lumbar radiculopathy, bilateral carpal tunnel syndrome, systemic lupus erythematosus, and arthritis in the Evaluation and Questionnaire. (Tr. 232-36.) He additionally documented plaintiff's prescribed medication as Celebrex[17] and noted that she was undergoing physical therapy. (Tr. 233.)

---

[17] "Celebrex," also known as "Celecoxib," is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain and help relieve symptoms of arthritis (e.g., osteoarthritis, rheumatoid arthritis, or juvenile rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain. It does not cure arthritis and will only help users as long as they take it. *See* Mayo Clinic, *Celecoxib (Oral Route)* (2010), *available at* http://www.mayoclinic.com/health/drug-information/DR601969 (last visited May 6, 2011).

Dr. Zelefsky also specifically addressed plaintiff's RFC in the Evaluation and Questionnaire. (Tr. 234.) He reported that she could lift up to five pounds frequently, and up to ten pounds maximum, and could only stand or walk for one to two hours and sit for two to four hours during an eight-hour workday. (*Id.*) He also opined that she could walk three to six blocks without stopping and was able to travel alone by bus and subway. (Tr. 235.) To support these conclusions, Dr. Zelefsky cited signs of nerve root impingement[18] and his opinion that prolonged walking, standing, and sitting would increase plaintiff's intrathecal pressure.[19] (*Id.*) He further noted that plaintiff could never stoop, bend, crouch, or climb, and could only occasionally kneel or balance. Dr. Zelefsky indicated that plaintiff had no problems stretching, reaching, grasping, pushing/pulling or performing fine manipulations and that her ability to perform work-related activities was adversely affected by heights, humidity, vibration, moving machinery and temperature extremes. (*Id.*) Additionally, he documented that

---

[18] "Nerve root syndromes are those that produce symptoms of nerve impingement (a nerve is touched), often due to a herniation (or bulging) of the disc between the lower back bones. Sciatica is an example of 'nerve root impingement.' Impingement pain tends to be sharp, in one spot, and associated with numbness in the area of the leg that the affected nerve supplies." *See* WebMD, *Causes of Lower Back Pain* (2007), *available at* http://www.webmd.com/back-pain/guide/lower-back-pain-causes (last visited May 6, 2011).

[19] "Intrathecal" means "introduced into or occurring in the space under the arachnoid membrane of the brain or spinal cord." *See Merriam-Webster's Collegiate Dictionary*, "intrathecal" (11th ed. 2003), *available at* http://www.merriam-webster.com/dictionary/intrathecal (last visited May 6, 2011).

plaintiff has to lie down during the day when her pain flares up. (*Id.*)

When Dr. Zelefsky re-evaluated plaintiff on September 20, and October 25, 2007, plaintiff still complained of neck pain radiating to her right shoulder, pain down her right arm coupled with numbness of both hands, bilateral hand pain, low back pain, numbness in her right foot, and pain radiating to her bilateral lower extremities. (Tr. 291, 295.) His findings were similar to those made on plaintiff's prior visits, except that on the October visit Dr. Zelefsky noted that plaintiff's left hand was significantly cooler than her right. (Tr. 291-98.) He stated that if plaintiff's symptoms of increased numbness and temperature changes persisted in the right arm, she should undergo a work up for complex regional pain syndrome and consult her rheumatologist to determine if the temperature changes could be related to a Raynaud's formina. (Tr. 298.)

Plaintiff returned to Dr. Zelefsky on January 29, and March 6, 2008 with the same complaints. In January, Dr. Zelefsky wanted to rule out complex regional pain syndrome (Tr. 303), and in March, Dr. Zelefsky requested a three-phase bone scan to rule out reflex sympathetic dystrophy. (Tr. 308.)

In an evaluation on April 8, 2008, Dr. Zelefsky called plaintiff "a woman with chronic pain," and reported that she had signs of cervical radiculopathy, disc bulges, lumbosacral

radiculopathy, cervical, thoracic, and lumbosacral myofascitis, bilateral carpel tunnel syndrome, lupus, arthritis, and fibroids.  (Tr. 313.)  He again requested a three-phase bone scan to rule out reflex sympathetic dystrophy and indicated that plaintiff should follow-up with her rheumatologist.  (*Id.*) Finally, he listed her medications as Celebrex, Vicodin,[20] and Lyrica.[21]  (Tr. 310.)

### d.  Dr. Sheldon Schwartz

Dr. Sheldon Schwartz, plaintiff's treating rheumatologist, evaluated plaintiff for rheumatoid arthritis. (Tr. 15, 357.)  Dr. Schwartz first saw plaintiff in August 2006, stopped seeing her beginning the summer of 2007, and resumed seeing her in May 2008.  (Tr. 226, 387.)

In a Medical Impairment Evaluation and Questionnaire as to RFC dated September 21, 2006, Dr. Schwartz listed plaintiff's symptoms as pain, swelling, and weakness of the hands and feet, pain in her cervical spine, and difficulty in bending due to low back pain.  (Tr. 226.)  Moreover, he affirmed

---

[20] "Vicodin" contains Hydrocodone and Acetaminophen, a combination used to relieve moderate to moderately severe pain.  *See* Mayo Clinic, *Hydrocodone and Acetaminophen (Oral Route)* (2010), *available at* http://www.mayoclinic.com/health/drug-information/DR603225 (last visited May 6, 2011).

[21]  "Lyrica" is the brand name for "Pregablin," which is used with other medicines to help control certain types of seizures (convulsions) in the treatment of epilepsy.  It is also used to manage a condition called postherpetic neuralgia (pain that occurs after "shingles") and for pain caused by nerve damage associated with diabetes.  *See* Mayo Clinic, *Pregabalin (Oral Route)* (2010), *available at* http://www.mayoclinic.com/health/drug-information/DR601627 (last visited May 6, 2011).

that plaintiff's impairments have lasted or can be expected to last at least twelve months. (Tr. 228.) His laboratory findings revealed, among other things, a negative rheumatoid factor.[22] (Tr. 227.) Additionally, Dr. Schwartz found that an MRI of the lumbar spine showed scoliosis,[23] but the rest of the examination was "unremarkable." (Tr. 225.)

Dr. Schwartz ultimately made no diagnosis, writing that he was "not certain" about what diagnosis to make. (Tr. 226.) He did opine, however, that rheumatoid arthritis, systemic lupus erythematosus, or "other disease" were "probable." (*Id.*) He prescribed plaintiff with Prednisone[24] for rheumatoid arthritis and Ibuprofen for pain. (Tr. 231.)

Dr. Schwartz also specifically addressed plaintiff's RFC. (Tr. 228.) Like Dr. Zelefsky, Dr. Schwartz found

---

[22] "A rheumatoid factor test measures the amount of rheumatoid factor in your blood. Rheumatoid factors are autoantibodies — proteins produced by your immune system that can attack healthy tissue in your body. It's not clear what causes your immune system to produce rheumatoid factor. High levels of rheumatoid factor in the blood are most often associated with autoimmune diseases such as rheumatoid arthritis and Sjogren's syndrome. But rheumatoid factor may be detected in some healthy people, and people with autoimmune diseases sometimes have normal levels of rheumatoid factor." WebMD, *Rheumatoid factor* (2008), *available at* http://www.mayoclinic.com/health/rheumatoid-factor/MY00241 (last visited May 6, 2011).

[23] As will be set forth, infra, Dr. Plotz, a non-examining rheumatologist who testified at plaintiff's June 10, 2008 hearing as a medical expert, stated at the hearing that scoliosis was "very common" and "not at all disabling." (Tr. 398, 401-402.)

[24] Prednisone is used to treat conditions such as certain types of arthritis, severe allergic reactions, multiple sclerosis (a disease in which the nerves do not function properly), lupus (a disease in which the body attacks many of its own organs), and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. *See* AHFS Consumer Medication Information, *PubMed Health – Prednisone* (2008), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091 (last visited May 6, 2011).

plaintiff's RFC encompassed less than the full range of sedentary work. (Tr. 226-30.) He opined that plaintiff could lift up to five pounds frequently, and could not stand, walk, sit, stoop, bend, crouch, climb, kneel, or balance at all during an eight-hour workday. (*Id.*) He also reported that she had problems stretching, reaching, grasping, pushing, or pulling with both hands and arms, and had problems doing fine manipulations with both hands. (Tr. 229.) Moreover, he claimed that she could not walk more than half of a block without stopping and was unable to travel alone by bus or subway. (*Id.*) He noted she was adversely affected by fumes, dust, heights, chemicals, humidity, vibration, noise, moving machinery and temperature extremes. (*Id.*) He also indicated that she had to lie down during the day due to fatigue. (*Id.*) Unlike Dr. Desroches and Dr. Zelefsky, Dr. Schwartz noted that the plaintiff was depressed in addition to suffering from physical impairments.[25] (Tr. 230.)

In a letter dated June 9, 2008, Dr. Schwartz stated plaintiff had been under his care since August 21, 2006 for the treatment of rheumatoid arthritis.[26] (Tr. 358.) In the letter,

---

[25] A Biopsychosocial Report by Dr. Vito Taverna dated May 25, 2006 noted that plaintiff had no emotional problems. (Tr. 256.) Plaintiff denied having emotional problems as well. (Tr. 185.)

[26] During the June 10, 2008 hearing, the ALJ called this letter "a fraudulent document at this point in time" and indicated that he would investigate its authenticity, citing the letter's handwriting, its misspelling of the word "due," and the manner in which Dr. Schwartz's name was written out in it.

he also described plaintiff's symptoms as swelling, tenderness, and constant pain of the hands, feet, and knees. (*Id.*) He concluded that plaintiff's conditions rendered her "totally disabled." (*Id.*) He further noted that plaintiff, at that time, had not responded to Prednisone in high doses and was to start in Methotrexate.[27] (*Id.*)

### e. Drs. Hugh Richardson, Marzana Mleczko, and Mary Ann Bilotti

Dr. Desroches referred plaintiff to Long Island Podiatry where podiatrists, Drs. Hugh Richardson, Marzana Mleczko, and Mary Ann Bilotti evaluated her. (Tr. 214-24.)

Dr. Richardson first evaluated plaintiff on December 30, 2005 for a complaint of left foot pain that she had been experiencing for three years resulting in an inability to walk. (Tr. 214.) Plaintiff denied a history of trauma. (*Id.*) Dr. Richardson found that plaintiff had a normal range of motion of the ankle, midfoot, subtalar joint, and MTP joints[28] bilaterally. (Tr. 215.) Dr. Richardson reported nonspecific tenderness in

_____

(Tr. 363-65.) Plaintiff defended the authenticity of the letter, stating that she believed Dr. Schwartz's receptionist wrote it. (Tr. 365.) Although the record does not reflect the results of the ALJ's investigation into the letter's authenticity, the court notes that the ALJ cited to the letter in his November 26, 2008 opinion. (*See* Tr. 28) ("In a letter dated June 9, 2008 Dr. Schwartz repeated his opinion that claimant is disabled.")

[27] Methotrexate is used to treat rheumatoid arthritis. MedicineNet, *Definition of* Methotrexate (2008), *available at* http://www.medicinenet.com/methotrexate/article.htm (last visited May 6, 2011)

[28] "MTP joints" refer to the metatarsophalangeal joints which reside in the foot at the base of the toes. *See* WebMD, *Bunion: Metatarsophalangeal joint* (2008), *available at* http://www.webmd.com/hw-popup/bunion-metatarsophalangeal-joint (last visited May 6, 2011).

plaintiff's left foot and guarding to range of motion against the fixed hand and that plaintiff was unable to rise on her heel on her right foot without pain. (*Id.*) Dr. Richardson's impression was chronic sprain of the right foot versus tenosynovitis versus fracture of the left foot and pigment lesion of the right hallux. (*Id.*) He recommended an MRI of the left foot, and advised plaintiff to avoid walking barefoot and to start Arthrotec.[29] (*Id.*)

Plaintiff saw Dr. Richardson for a follow-up examination on January 6, 2006 and again February 3, 2006, during which he noted that plaintiff was limited in excessive ambulation and prolonged standing. (Tr. 216-17.) An MRI was taken of plaintiff's left foot on February 6, 2010. (Tr. 224.) On February 10, 2006, Dr. Richardson reported that the MRI was "unremarkable," except for mild inflammation at the dorsal lateral aspect of the left foot, for which Dr. Richardson gave plaintiff an injection of Marcaine plus dexamethasone. (Tr. 218.)

Dr. Mleczko followed up with plaintiff on March 10, 2006. (Tr. 219.) Plaintiff was still complaining of moderate to severe pain on ambulation and on direct palpation. (*Id.*)

---

[29] Arthrotec is used for treating signs and symptoms of rheumatoid arthritis or osteoarthritis in patients at risk for developing ulcers from nonsteroidal anti-inflammatory drugs. MedicineNet, *Definition of Arthrotec* (2005), *available at* http://www.medicinenet.com/diclofenac_and_misoprostol/article.htm

Dr. Mleczko found mild-to-moderate edema with tenderness on palpation mainly at the level of the anterior talofibular and distally.  Furthermore, Dr. Mleczko noted that plaintiff was treated with a local injection of Marcaine plus dexamethasone during her last visit with Dr. Richardson but that the injection did not alleviate plaintiff's symptoms.  (Tr. 218-19.) Plaintiff also reportedly tried numerous NSAIDs and Medrol Dosepak[30] without relief of her symptoms.  (Tr. 219.)

Dr. Bilotti evaluated plaintiff on March 24, 2006, noting that plaintiff had shown no improvement.  (Tr. 220.)  An Unna boot,[31] which plaintiff had also tried, did not help.  (*Id.*)

On April 20, 2006, Dr. Richardson reported that plaintiff was awaiting consultation with an orthopedic surgeon for her cervical and lower spine and directed her to take Advil. (Tr. 221.)  Plaintiff saw Dr. Richardson for another follow-up on May 11, 2006, and reported that plaintiff had bilateral foot pain, left greater then right, with edema.  (Tr. 222.)  Dr.

---

[30] "Medrol Dosepak," also known as "methylprednisolone" is a steroidal drug that prevents the release of substances in the body that cause inflammation. It is used to treat conditions such as arthritis and lupus.  *See* Cerner Multum, Inc., *Medrol Dosepak (methylprednisolone)* (2006), *available at* http://www.drugs.com/mtm/medrol-dosepak.html (last visited May 6, 2011).
[31]  An "Unna boot" is "a compression dressing for varicose veins or ulcers consisting of a paste made of zinc oxide, gelatin, glycerin, and water that is applied to the lower leg, covered with a bandage, and then applied to the outside of the bandage."  See *Merriam-Webster's Collegiate Dictionary*, "Unna's boot" (11th ed. 2003), *available at* http://www.merriam-webster.com/medical/unna%27s%20boot (last visited May 6, 2011).

Richardson continued plaintiff on anti-inflammatories and soft accommodation shoe gear.  (*Id.*)

Dr. Bilotti evaluated plaintiff again on July 11, 2006, when plaintiff was reportedly in an "extreme" amount of pain, feeling as if she had been "beat up."  (*Id.*)  Dr. Bilotti characterized the pain in plaintiff's ankle as "progressive" and "radiating into her foot."  (*Id.*)  Plaintiff also reportedly experienced "achiness" in her hands and feet around all of her joints.  (*Id.*)  Dr. Bilotti indicated that plaintiff may have an underlying rheumatological disorder and recommended that plaintiff see a rheumatologist.  (*Id.*)

### 3.  Examining Sources

#### a.  Dr. Soo Park

Dr. Soo Park is a consultative examiner who examined plaintiff only one time on October 7, 2004 at the request of the SSA.  (Tr. 17.)  Unlike Drs. Desroches, Zelefsky, and Schwartz, Dr. Park gave plaintiff a prognosis of "fair" and opined that plaintiff only had "limitations of a mild degree" with respect to lifting, bending, walking, standing, and pushing and pulling on arm controls.  (Tr. 186.)

Dr. Park conducted a physical examination of plaintiff and observed that she was able to dress and undress, as well as get on and off the examination table without any difficulty. (Tr. 185.)  He further noted that although plaintiff limped with

her right leg and used a cane, he did not believe that she needed the cane. (*Id.*) Dr. Park noted that plaintiff refused to test the lumbar spine range of motion during the examination, but did not indicate whether the refusal was due to pain or some other reason. (Tr. 186.)

With regard to tests on plaintiff's extremities, Dr. Park reported a normal range of motion of plaintiff's upper and lower extremities. (*Id.*) He did document, however, that plaintiff refused to test the range of motion of her left shoulder. (*Id.*) Additionally, he reported that the Romberg's sign was negative,[32] that there was no clubbing,[33] cyanosis,[34] or edema, and that straight leg raising was to sixty degrees.

On October 11, 2004, plaintiff's x-ray results were sent to Dr. Park's treating facility. (Tr. 187.) An x-ray of plaintiff's lumbar spine revealed lumbar straightening, and an x-ray of the cervical spine revealed straightening as well as disc space narrowing at C6-C7 and mild narrowing of the C2-C3 disc space. (Tr. 186, 187.)

---

[32] "[W]ith feet approximated, the subject stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the Romberg sign is positive." *See* Stedman's at 373770.

[33] "Clubbing" refers to "a condition affecting the fingers and toes in which proliferation of distal soft tissues, especially the nail beds, results in thickening and widening of the extremities of the digits; the nails are abnormally curved nail beds excessively compressible, and skin over them red and shiny." *See* Stedman's at 83300.

[34] "Cyanosis" refers to "a dark bluish or purplish discoloration of the skin and mucous membrane due to deficient oxygenation of the blood, evident when reduced hemoglobin in the blood exceeds 5 g/100 ml." *See* Stedman's at 98250.

### b. Dr. Steven Calvino

Dr. Steven Calvino is a consultative examiner who examined plaintiff once on February 25, 2008 at the request of the SSA. (Tr. 18.) Like Dr. Park, Dr. Calvino gave plaintiff a prognosis of "fair," opining that she was "moderately limited" in heavy lifting, carrying, squatting, kneeling, carrying, pushing, and pulling activities. (Tr. 239.) He found no restrictions for sitting. (*Id.*) His final diagnoses were chronic neck and back pain and a history of lupus. (*Id.*)

Dr. Calvino reported that plaintiff told him that there was no specific traumatic incident that preceded the onset of her neck and back pain. (Tr. 237.) He also reported that plaintiff listed "going out for walks" as one of her daily activities, and that plaintiff also claimed she was unable to do any cooking, cleaning, or laundry due to pain. (Tr. 238.) Plaintiff also reportedly told Dr. Calvino that her medications - Prednisone, Lyrica, Ibuprofen, Vicodin, and Celebrex - relieved her pain "somewhat." (Tr. 237.)

During the examination, Dr. Calvino found plaintiff's gait and station to be normal. (Tr. 238.) He also observed that she could walk on heels and toes without difficulty, squat fully, and that she used no assistive devices. (*Id.*). Furthermore, she needed no help changing or getting on and off

the examination table, and was able to rise from a chair without difficulty.  (*Id.*)

In testing her fine motor activity of the hands, Dr. Calvino noted that plaintiff declined to perform grip strength on the right due to pain, and that grip strength was 4/5 on the left with "a poor effort noted."  (*Id.*)

In evaluating her cervical spine, Dr. Calvino noted that the forward flexion of the spine was full.  (*Id.*)  He additionally reported that plaintiff declined performing an extension as well as a lateral flexion bilaterally and a lateral rotation of the neck to the right "due to pain."  (*Id.*)

With regard to her upper extremities, Dr. Calvino reported a full range of motion of plaintiff's left shoulder as well as a full range of motion for her elbows, forearms, wrists, and fingers bilaterally.  (Tr. 239.)  He found no limits in fine motor activities of her left upper extremity.  (*Id.*)  Adduction on the right and rotation on the right were full as well.  (*Id.*) He found limits in the former flexion of the right shoulder, abduction of the right shoulder, and external rotation on the right.  (*Id.*)  He noted that the plaintiff declined to perform manual muscle testing on the right due to pain.  (*Id.*)

With regard to plaintiff's thoracic and lumbar spines, Dr. Calvino reported full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally.  (*Id.*)

In testing plaintiff's lower extremities, Dr. Calvino found a full range of motion of the hips, knees, and ankles bilaterally, as well as 5/5 strength in proximal and distal muscles bilaterally. (*Id.*)

### 4. Non-Examining Sources

#### a. Dr. Charles Plotz

Dr. Charles Plotz, a non-examining rheumatologist, testified as a medical expert at plaintiff's June 10, 2008 hearing, based solely on his reading of the record and the testimony that he heard at the hearing. (Tr. 398-404.) Through his analysis of the record, he opined that plaintiff retained the residual functional capacity to sit for a full eight hours and stand and walk for at least six hours in the course of an eight-hour workday. (Tr. 399.) He also stated his belief that plaintiff could lift and carry up to fifty pounds. (*Id.*)

To support his RFC finding, Dr. Plotz stated that there was no evidence of rheumatoid arthritis, systemic lupus, osteoarthritis, or any other kind of arthritis in her medical records. (*Id.*) He also noted that there was "simply no evidence for any physical cause for any of the complaints that [plaintiff] currently has." (*Id.*) He went on to assert that, although plaintiff had varicose veins with a clot in the right leg and had had two "minor" operations in 2004 and 2005 to strip the incompetent veins in both legs, the healing would only

affect her ability to walk for two to three weeks. (Tr. 399-401.)  In further support of his RFC finding, Dr. Plotz favorably cited Dr. Zelefsky's conclusion that plaintiff did not have any swelling, warmth, or erythema of her hands, and that she had a full range of motion in her hands.  (Tr. 399.)  Dr. Plotz stated that Dr. Zelefsky's RFC assessment was inconsistent with plaintiff's complaints.  (Tr. 402.)

On cross-examination by plaintiff's attorney, Dr. Plotz admitted that plaintiff's complaints were consistent with arthritis, but reasserted that they were not consistent with any of the other diagnoses.  (Tr. 400.)  He also testified that the thecal sac impingement, which was shown on the March 2007 MRI was not significant, and that it was different from nerve root impingement. (Tr. 401-03.)  He finally stated that plaintiff had no evidence of rheumatoid arthritis.

### b.   Al Grazia

Mr. Al Grazia, State Agency reviewer and medical consultant, reviewed the record and provided an opinion consistent with a light RFC.  (Tr. 17, 201-06.)  He considered plaintiff's allegations of back pain and varicose veins "partially credible" and concluded that she had the capacity to perform her past work as a receptionist.  (Tr. 202, 204.) Specifically, he found that she could occasionally lift up to twenty pounds, frequently lift up to ten pounds, could stand

and/or walk as well as sit with normal breaks for six hours in an eight-hour work day, and was unlimited in pushing and/or pulling.  (Tr. 202.)

## D.  Testimony of Vocational Expert

Mr. Andrew Pasternak testified at plaintiff's June 10, 2008 hearing as a vocational expert.[35]  (Tr. 404-09.)  He classified the job of a receptionist as semi-skilled and sedentary, citing the U.S. Department of Labor, Dictionary of Occupational Titles. (Tr. 405.)  He claimed that, based upon Dr. Plotz's testimony, plaintiff could perform all of her past relevant work.  (Tr. 408.)

Plaintiff's attorney asked Mr. Pasternak to suppose that plaintiff retained hypothetical capabilities including an ability to lift only five pounds frequently and a maximum of ten pounds, as well as an ability to stand and walk for only one to two hours and sit for two to four hours in an eight-hour work day.  (Tr. 409.)  In response, Mr. Pasternak testified that if plaintiff retained these hypothetical capabilities, she would not be able to perform any of her past work.  (*Id.*)  He also asserted that there would be no jobs available for her in the job market.  (*Id.*)

---

[35]  The record does not reflect whether Mr. Pasternak testified as an impartial vocational expert, on behalf of plaintiff or on behalf of defendant.  (*See* Tr. 404.)

## DISCUSSION

Defendant argues that the Commissioner correctly
determined that the plaintiff was not disabled and that she
retained the ability to perform sedentary work. (ECF No. 19,
Mem. of Law in Support of the Def.'s Mot. for J. on the
Pleadings ("Def.'s Mem.") at 21-29.) Plaintiff argues that the
decision is erroneous because the Commissioner: (1) failed to
give proper weight to the opinions of plaintiff's treating
physicians; (2) failed to set forth plaintiff's severe
impairments; (3) failed to consider whether plaintiff's well-
documented ailments of bilateral carpal tunnel syndrome,
bilateral foot condition, lupus, and rheumatoid arthritis were
severe, and, if so, whether they impacted her ability to perform
sedentary work; (4) failed to properly evaluate plaintiff's
credibility; and (5) misinterpreted the vocational expert's
testimony. (*See* ECF No. 20, Pl.'s Mem. of Law in Opp. to Def.'s
Mot. for J. on the Pleadings ("Pl.'s Opp'n") at 4-27.) In light
of these alleged failures, plaintiff requests that this court
reverse the decision of the Commissioner and grant a decision in
favor of plaintiff, or remand the case for further development
on the record. (*Id.* at 25, 27.) Defendant maintains that there
is substantial evidence in the record to support the ALJ's
decision and that plaintiff's arguments to the contrary are

unavailing. (*See generally* ECF No. 21, Def.'s Reply Mem. of Law ("Def.'s Reply").)

**A.  Standard of Review**

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations and quotation marks omitted). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. *See* 42 U.S.C. § 405(g) (providing that Commissioner's factual findings are conclusive if supported by substantial evidence). Moreover, the reviewing court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)

(quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

## B.    Determining Whether a Claimant is Disabled

A claimant is disabled under the Social Security Act when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity" that the claimant is "not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis requiring the ALJ to make a finding of disability if he or she determines:

> (1) that the claimant is not working,[36] (2) that he [or she] has a 'severe impairment,'[37] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that

---

[36]  Under the first step, if the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings.  20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[37]  Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities" in order to have a severe impairment.  20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii).

conclusively requires a determination of disability,[38] and (4) that the claimant is not capable of continuing in his [or her] prior type of work,[39] the Commissioner must find him disabled if (5) there is not another type of work that claimant can do.[40]

*Burgess*, 537 F.3d at 120 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

During this five-step process, the Commissioner must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (citing 20 C.F.R. § 404.1523) (internal citations omitted and alteration in original). Further, if the Commissioner "do[es] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." *Id*. (citing 20 C.F.R. § 416.945(a)(2)) (alteration in original).

---

[38] Under the third step, if the claimant has an impairment that meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

[39] Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(f). .

[40] Under the fifth step, the claimant may still be considered not disabled if he or she "can make an adjustment to other work" available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g).

In steps one through four, "of the sequential five-step framework," the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. In step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RCF, age, education and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

## C. The ALJ's Disability Determination

Using the five-step sequential process to determine whether a claimant is disabled mandated by 20 C.F.R. § 404.1520(a)(4), the ALJ determined at step one that plaintiff has not engaged in substantial gainful activity since her alleged onset date. (Tr. 26.) At step two, the ALJ found that plaintiff has medically determinable severe impairments but did not explicitly identify those impairments.[41] (Tr. 26 (stating only that the plaintiff "has medically determinable severe impairments").) Instead, the ALJ summarized the medical record, stated that plaintiff's alleged disability is due to "back pain and varicose veins," and discussed, without reconciling, the

---

[41] The court notes that in the ALJ's January 23, 2007 decision, which was subsequently vacated and remanded by the Appeals Council on October 18, 2007, the ALJ specifically listed "disorders of the back; scoliosis; varicose veins, right leg, status post surgery; and left foot/ankle pain" as plaintiff's "severe impairments." (Tr. 49.)

conflicting opinions and diagnoses of plaintiff's treating, examining, and non-examining sources.[42]  (Tr. 26-28.)  At step three, the ALJ found plaintiff to lack an impairment or combination of impairments listed in Appendix 1 of the regulations that would conclusively require a disability determination.  (*Id.*)

    At step four, the ALJ found that plaintiff is not disabled, concluding that she has the RFC to perform the full range of sedentary work and to perform her past relevant work as a receptionist.  (Tr. 28-31.)  Specifically, the ALJ found the following:

> The claimant has multiple body complaints, but no significant abnormalities.  MRI is negative for frank disc herniation or exiting nerve root involvement. Sensation is largely intact.  Motor power is generally full with only mild loss in the right upper extremity. She does not have swelling or warmth in the hands or fingers.  She demonstrated good cervical and lumbar spine motion, without spasm.  Left upper extremity motion was reduced somewhat.  Right upper extremity motion is full, with complete motor power and only mild loss of sensation.  Motion in the lower extremities is full.  *It is therefore found that the claimant can sit, stand and walk for up to 6 hours in an 8 hour day, and she can lift or carry as many as 10 pounds occasionally.*[43]  She has no non-exertional limitations.

---

[42]  *Compare* Dr. Zelefsky's diagnosis of arthritis and lupus and Dr. Calvino's finding of a history of lupus *with* Dr. Plotz's finding that there is no evidence the plaintiff suffers from rheumatoid arthritis or from lupus.  (Tr. 28.)

[43]  Notably, in his January 23, 2007 decision, which, as noted, was subsequently vacated and remanded by the Appeals Council, the ALJ found that plaintiff had the RFC to stand/walk for a total of two hours, could sit for a total of about six hours, could carry five pounds frequently and 10 pounds occasionally, and could occasionally climb, balance, stoop, bend, kneel, crouch and crawl.  (Tr. 49.)

> In making this finding, the undersigned considered all
> symptoms and the extent to which these symptoms can
> reasonably be accepted as consistent with the
> objective medical evidence and other evidence, based
> on the requirements of 20 C.F.R. [§§] 404.1529 and
> 416.929 and SSRs 96-4p and 96-7p. The undersigned
> also considered opinion evidence in accordance with
> the requirements of 20 C.F.R. [§§] 404.1527 and
> 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(Tr. 28-29 (emphasis added).)

In deciding that plaintiff retained the RFC to perform the full range of sedentary work, with varying degrees of limited explanation, the ALJ accorded treating physician Dr. Desroches's opinion "reduced weight," refused to grant treating physician Dr. Zelefsky's opinion "great or controlling weight" and accorded "limited weight" to the opinion of treating physician Dr. Schwartz. (Tr. 27, 30.) The ALJ did not explicitly address what weight, if any, he accorded the opinions of plaintiff's treating physicians, Dr. Garvey, Dr. Richardson, Dr. Mleczko, or Dr. Bilotti, and did not reconcile these physicians' opinions with the conflicting opinions of SSA's consultative examiners, Dr. Park and Dr. Calvino, or of non-examining testifying medical expert Dr. Plotz. (*See generally* Tr. 24-31.)

Additionally, the ALJ indicated that he based his decision that plaintiff is not disabled on his determination that plaintiff's allegations were "disproportionate to the

record." (Tr. 30.) Although the ALJ found that plaintiff's impairments could be expected to produce her alleged symptoms, he concluded that plaintiff's statements regarding the "intensity, persistence and limiting effects" of those symptoms were "not entirely credible." (*Id.*)

**D. Analysis: SSI Claim**

**1. The ALJ's Evaluation of the Opinions of Plaintiff's Treating Physicians**

**a. Legal Standard**

"Regardless of its source," the regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Under the Commissioner's regulations, the medical opinion of a treating source "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Burgess*, 537 F.3d at 128. Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential

diagnostic tool." *Green-Younger*, 335 F.3d at 107 (internal citation and quotation marks omitted).

According to the Commissioner's regulations, the opinions of treating physicians deserve controlling weight because "'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . .'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 264 (E.D.N.Y. 2010) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). It also true, however, that the less consistent a treating doctor's opinion is with the record as a whole, the less weight it will be given. *Snell*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)). Moreover, under the regulations, opinions of non-treating and non-examining doctors can override those of treating doctors so long as they are supported by evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f).).

Where a treating physician's opinion on the nature and severity of a claimant's disability is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating

physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33) (internal quotation marks omitted). Although the regulations do not explicitly or exhaustively define what constitutes "good reasons" for the weight given to a treating physician's opinion, the regulations provide the following enumerated factors that guide an ALJ's determination when declining to afford controlling weight to a treating physician on the issue of the nature and severity of a disability: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treating relationship; (3) the supportability of the treating source opinion; (4) the consistency of the opinion with the rest of the record; (5) the specialization of the treating physician, and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); *see also Burgess*, 537 F.3d at 129; *Snell*, 177 F.3d at 133.

Although the SSA also considers opinions from treating physicians regarding the RFC and disability of a claimant, the final responsibility for determining these matters is reserved to the Commissioner, not to physicians; therefore, the source of an opinion on those matters is not given "special significance" under the regulations. *Francois v. Astrue*, No. 09-CV-6625, 2010 WL 2506720, at *6 (S.D.N.Y. June 21, 2010) (citing 20 C.F.R. § 404.1527(e)(3)); *see also* 20 C.F.R. § 416.927(e)(1) ("A

statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Snell*, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). In fact, "[t]he Commissioner is not required, nor even necessarily permitted, to accept any single opinion, even that of a treating physician, as dispositive on the determination of disability." *Francois*, 2010 WL 2506720, at *5 (citing *Green-Younger*, 335 F.3d at 106). The ALJ, however, may not "arbitrarily substitute his own judgment for competent medical opinion." *Balasmo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted).

Despite the fact that the disability determination is reserved for the Commissioner, the Second Circuit has held that ALJs are not exempt "from their obligation, under *Schaal*[44] and [20 C.F.R.] § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even - and perhaps especially - when those dispositions are unfavorable."); *see also* 20 C.F.R. § 404.1527(d)(2) (the SSA "will always give good reasons in [its] notice of determination or decision for the weight [given to the claimant's] treating

---

[44] *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998)

source's opinion"); *Martinez v. Astrue*, No. 06-CV-6219, 2010 WL 331694, at *9 (S.D.N.Y. Jan. 28, 2010) ("'If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.'" (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996))).

An ALJ's failure to explicitly state "good reasons" for declining to adopt a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. *Snell*, 177 F.3d at 133-34 (remanding for a statement of the reasons why a treating source's finding of disability was rejected by the ALJ). An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is also a ground for remand. *Caserto v. Barnhart*, 309 F. Supp. 2d 435, 445 (E.D.N.Y. 2004); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

### b. Analysis

Remand is required because the ALJ rejected the medical opinions and RFC determinations of Drs. Desroches, Zelefsky, and Schwartz without setting forth good reasons for doing so and without attempting to reconcile their opinions and RFC determinations with the conflicting opinions and RFC determinations of the consulting and non-examining physicians in the record. Remand is also required because the ALJ failed to

45

indicate how much weight he gave the opinions of treating podiatrists Drs. Richardson, Mleczko, and Bilotti, and, if he gave the opinions of these doctors less than controlling weight, he failed to provide good reasons for doing so.

Here, treating Drs. Desroches, Zelefsky, and Schwartz all found that plaintiff was unable to perform the full range of sedentary work.[45] Specifically, Dr. Desroches found that plaintiff could sit for less than 6 hours and lift no more than five pounds, Dr. Zelefsky found that plaintiff could only sit between 2 to 4 hours, stand for 1 to 2 hours and lift up to 10 pounds occasionally, and Dr. Schwartz found that plaintiff could not stand, walk or sit at all and could lift no more than five pounds. (Tr. 194-95, 228, 234.) Further, Dr. Richardson found that plaintiff should limit "excessive ambulation and prolonged standing," and reported that plaintiff had bilateral foot pain. (Tr. 217, 222.) On the other hand, Dr. Calvino found plaintiff was not restricted in sitting and Dr. Plotz opined that plaintiff could sit for 8 hours and walk or stand for 6 hours and could lift up to fifty pounds. (Tr. 239-40, 399.) Thus, the opinions of plaintiff's treating physicians are in direct

---

[45] As noted, in order to meet the exertional requirements to perform a full range of sedentary work, a person must be able to sit for approximately six hours total and stand or walk for about two hours in an eight-hour workday and lift no more than 10 pounds. *See Rosa*, 168 F.3d at 78 n.3; *Perez*, 77 F.3d at 46; 20 C.F.R. § 404.1567(a)). A claimant who is only able to sit up to five hours is not capable of performing sedentary work. *See, e.g.*, *Miceli v. Chater*, No. 95-CV-3763, 1996 WL 370161, at *1 (E.D.N.Y. June 24, 1996).

conflict with those of Dr. Calvino and Dr. Plotz. By concluding

that plaintiff could sit, walk, and stand for 6 hours in an 8-

hour day and lift up to 10 pounds occasionally, the ALJ credited

the opinion of Drs. Calvino and Plotz over the opinions of

plaintiff's treating physicians Drs. Desroches, Zelefsky,

Schwartz, and Richardson. Although the ALJ is not required to

accept any single opinion - even that of a treating physician -

as dispositive of the disability determination, the ALJ was

required to explain why he chose not to credit plaintiff's

treating physicians' opinions, and to reconcile the conflicting

RFC opinions of the doctors in the record.[46] Here, however, the

ALJ failed to do so.

As to Dr. Desroches, the ALJ stated that he "[took]

into account the opinion of [plaintiff's] personal physician

that [plaintiff] is disabled" in deciding that plaintiff is

capable of performing the full range of sedentary work. (Tr.

30.) However, the ALJ decided to accord Dr. Desroches's

---

[46] As noted, the regulations do not explicitly require the ALJ to consider
the enumerated five factors when determining the weight afforded to a
treating physician's opinion regarding the RFC or disability of a
claimant. *See* 20 C.F.R. §§ 404.1527(d), 404.1527(e) (requiring consideration
of the factors only when evaluating a treating source's medical opinion on
issues not reserved to the Commissioner). However, the Second Circuit
in *Snell* made clear that the ALJ's obligation to give "good reasons" for the
weight afforded to treating physicians even on issues of disability and
employability arises out of 20 C.F.R. § 404.1527(d)(2). *See Snell*, 177 F.3d
at 133-34. Accordingly, the court considers each of the five factors
articulated in 20 C.F.R. § 404.1527(d)(2) not as requirements but as a guide
in evaluating whether or not the ALJ gave adequate reasons in determining the
weight given to Drs. Desroches's, Zelefsky's, and Schwartz's opinions on
plaintiff's RFC. *See id.*

opinion "reduced weight," explaining, in two separate places in the opinion, but without elaboration, that Dr. Desroches's opinion is "not supported by the preponderance of the objective evidence of record," is "not consistent with the evidence of record [and that his] reported findings are not sufficient to support his contention that the claimant is disabled." (Tr. 27, 30.) Other than these conclusory statements, the ALJ failed to explain his reasons for giving Dr. Desroches's opinion "reduced weight" and failed to reconcile his opinion with those of other physicians. Although the ALJ gives general lip service to two factors that he may use to grant less than controlling weight to Dr. Desroches's opinion under 20 C.F.R. §§ 404.1527(d)(3)-(4) – i.e. that Dr. Desroches opinion is "not consistent" and not "support[ed]" by the administrative record – without more, this court cannot determine the reasons why the ALJ failed to give plaintiff's treating physician controlling weight. Although, as defendant argues, a reading of the record shows that Dr. Desroches's opinion is contradicted by other evidence, such as Dr. Park's finding that plaintiff is only "mildly limited" in her ability to lift, bend, walk, stand push, or pull, Dr. Calvino's finding that plaintiff is not restricted in sitting (*see* Def.'s Reply at 2-3), as well as Dr. Plotz's opinion that plaintiff was not disabled, Dr. Desroches's opinion is also consistent with the opinions of Drs. Zelefsky and Schwartz, as

well as with plaintiff's complaints.  It is this very conflict

that necessitates an explanation of why Dr. Desroches's opinions

were not credited over the doctors with contrary opinions.  *See*

*Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208, at *17-19

(E.D.N.Y. Dec. 9, 2010) (finding the ALJ's failure to reconcile

materially divergent RFC opinions of plaintiff's treating

physician and non-examining medical expert to be a ground for

remand); *see also Pratts v. Charter*, 94 F.3d 34, 39 (2d Cir.

1996) (noting that remand is appropriate where the reviewing

court is "unable to fathom the ALJ's rationale in relation to

the evidence in the record without further findings or clearer

explanation for the decision" (internal citation and quotation

marks omitted)).

Likewise, as to Dr. Zelefsky, the ALJ found that Dr.

Zelefsky's opinion "cannot be granted great or controlling

weight."  (Tr. 30.)  He questioned whether a treatment

relationship between Dr. Zelefsky and plaintiff existed.  (Id.)

Assuming a treatment relationship did exist, the ALJ concluded,

without elaboration, that Dr. Zelefsky's "reported findings also

fail to support the contention that [plaintiff] is disabled."

(Id.)  The ALJ also stated that Dr. Zelefsky's diagnosis of

radiculopathy was unconfirmed.  (Id.)

As an initial matter, the medical records before the

court demonstrate that a treating relationship existed between

the plaintiff and Dr. Zelefsky, as Dr. Zelefsky treated plaintiff approximately once a month between January, 2007 and April, 2008. (Tr. 266-323.) Indeed, the defendant concedes that plaintiff "saw Dr. Zelefsky monthly" (Def.'s Mem. at 4), and discusses Dr. Zelefsky's examinations of the plaintiff and findings at length. (*Id.* at 10-17.) Further, as previously discussed, the ALJ's conclusory statement that Dr. Zelefsky's findings do not support the contention that plaintiff is disabled is not sufficient to discharge his duty to give "good" reasons for assigning reduced weight to Dr. Zelefsky's opinion. *See Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal*, 134 F.3d at 505)). The only support the ALJ provides for this statement is his finding that Dr. Zelefsky's radiculopathy diagnosis is unconfirmed. However, even assuming that that the ALJ discharged his duty to develop the administrative record and that the radiculopathy diagnosis is, indeed, unconfirmed, Dr. Zelefsky additionally diagnosed plaintiff with bilateral carpal tunnel syndrome, systemic lupus erythematosus, and arthritis (Tr. 232), none of which the AJL addressed, even though the opinion specifically notes Dr. Plotz's conflicting opinion that "there was no evidence that [plaintiff] suffers from rheumatoid arthritis or from lupus." (Tr. 28; *see also* Tr. 399-400.)

Finally, to the extent the ALJ finds, as defendant argues, that Dr. Zelefsky's examination notes do not support his findings, on remand, the ALJ shall state his findings and provide good reasons for assigning reduced weight to Dr. Zelefsky's opinions. (Def.'s Mem. of Law at 26, Def.'s Reply at 3 (citing Tr. 399).)

As to Dr. Schwartz, plaintiff's treating rheumatologist, the ALJ determined that his opinion was entitled to "limited weight," based on Dr. Schwartz's alleged lack of a longitudinal history with plaintiff and Dr. Schwartz's failure to produce any treatment notes, progress notes, or office notes regarding plaintiff's treatment. (Tr. 30) The ALJ also noted that Dr. Schwartz's diagnosis of "probable rheumatoid arthritis" was inconsistent with Dr. Schwartz's notation that laboratory testing revealed a negative rheumatoid factor. (*Id.*) Moreover, the ALJ held that Dr. Schwartz's proposed RFC for plaintiff "is not supported by the preponderance of the objective medical evidence of record." (Id.)

First, the court notes that the ALJ incorrectly states that Dr. Schwartz had no longitudinal relationship with the plaintiff. In the ALJ's first decision dated January 23, 2007, the ALJ found that Dr. Schwartz first treated the [plaintiff] in August 2006 and therefore, ha[d] no longitudinal history with the [plaintiff]." (Tr. 51.) As of the June, 2008 hearing, however, plaintiff reported seeing Dr. Schwartz several times in

the past year.  (Tr. 386-87.)  Further, as will be discussed,
*infra*, the ALJ did not indicate whether he requested any
treatment notes, progress notes, or office notes regarding
plaintiff's treatment from Dr. Schwartz and, if such a request
was made, what response he received from Dr. Schwartz.  If the
ALJ believed that a Dr. Schwartz's opinion lacked support or was
internally inconsistent, the ALJ may not discredit the opinion
on this basis but must affirmatively seek out clarifying
information from the doctor.  *See, e.g.*, *Jeffcoat v. Astrue*, No.
09-CV-5276, 2010 WL 3154344, at *13-14 (E.D.N.Y. Aug. 6, 2010.)
Moreover, although Dr. Schwartz's specialty is rheumatology, the
same as Dr. Plotz's specialty, the ALJ failed to reconcile these
specialists' different opinions.  Finally, to the extent the ALJ
finds, as defendant argues, that plaintiff's assertion that she
could walk a block and a half and stand for fifteen minutes
contradicts Dr. Schwartz's RFC determination, the ALJ shall seek
clarifying information regarding perceived inconsistencies,
explain his analysis, and provide good reasons for his
conclusions on remand.  (Def.'s Mem. of Law at 25-26; Def.'s
Reply at 2-3 (citing Tr. 444).)  Thus, on remand, if, after
seeking clarifying information, the ALJ believes that the
opinion of Dr. Schwartz should still be afforded less weight,
the ALJ must give "good reasons" for discounting an opinion from
one of plaintiff's treating physicians, considering the factors

enumerated in 20 C.F.R. §§ 404.1527(d)(2)-(7), 416.9.27(d)(2)-(6).

Further, on remand, the ALJ shall discuss what weight, if any, he accords to the opinions of plaintiff's treating podiatrists, Drs. Richards, Mleczko, and Bilotti, who documented plaintiff's bilateral foot problems,[47] as well as reconcile the conflicting opinions between plaintiff's treating physicians and consultative examiners, Dr. Park and Dr. Calvino, and non-examining expert, Dr. Plotz.

## 2. The ALJ's Affirmative Duty to Develop the Record

### a. Legal Standard

"[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess*, 537 F.3d at 128; *see also* 20 C.F.R. § 702.338. Remand may be required where the ALJ fails to discharge his or her affirmative obligation to develop the record when making a disability determination. *See Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004); *Pratts*, 94 F.3d at 37; *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982). The ALJ bears this duty whether or not a claimant appears with representation. *See Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y.

---

[47] As will be explained below, it is unclear whether the ALJ simply did not credit a finding of bilateral foot condition, or whether he credited the diagnosis but found that it is not severe enough to permit a finding of disability.

2004) ("Although an ALJ's obligation to develop the record is heightened where the claimant appears *pro se*, the duty still exists even where the claimant is represented by counsel or a paralegal." (internal citations omitted)).

Thus, if an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor. *Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (finding that an ALJ's obligation to develop the record in a hearing exists independently from the claimant's obligation to present evidence on his or her own behalf). Moreover, a treating physician's "failure to include [proper] support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of this case." *Id.* at 118; *see also Hilsdorf v. Comm'r of Soc. Sec.*, No. 08-CV-5290, 2010 WL 2836374, at *12 (E.D.N.Y. July 15, 2010); 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be

based on medically acceptable clinical and laboratory diagnostic
techniques.").

### b. Analysis

Remand is also required because the ALJ failed to
adequately develop the record. Defendant argues that the ALJ
assigned diminished weight to the opinions of Dr. Desroches,
Zelefsky, and Schwartz because those opinions were
"contradict[ed] by other substantial evidence in the record,"
not because of inconsistencies or other gaps in the record.
(Def.'s Reply at 4.) It is clear, however, that the ALJ relied,
at least in part, on gaps in the administrative record to
demonstrate contradiction or lack of support. (*See, e.g.*, Tr.
30 (basing failure to give controlling weight to Drs. Schwartz
and Zelefsky respectively, in part, due to Dr. Schwartz's
"failure to produce any treatment notes, progress notes, or
office notes regarding plaintiff's treatment," the inconsistency
of Dr. Schwartz's opinion, and due to the fact that Dr.
Zelefsky's radiculopathy was unconfirmed).)

As plaintiff correctly argues, under the regulations
the ALJ must affirmatively seek out clarifying information from
physicians whose opinions the ALJ discounts. *See Hartnett v.
Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ
perceives inconsistencies in a treating physician's reports, the
ALJ bears an affirmative duty to seek out more information from

the treating physician and to develop the administrative record accordingly.").  Although the ALJ requested that plaintiff's counsel update and submit all of the charts from plaintiff's treating doctors in between the first and second hearings (*see* Tr. 387), the ALJ did not specify in his opinion whether he or the attorney actually requested treatment records from treating physicians and the response, if such a request was made.  This information is necessary to determine whether the ALJ discharged his duty to affirmatively seek out clarifying information where, as here, the record is void of treatment records supporting the Dr. Schwartz's opinion, and where the ALJ relies on internal inconsistencies in Dr. Schwartz's opinion and a lack of confirmation of Dr. Zelefsky's radiculopathy diagnosis to discredit these doctor's opinion.  *See, e.g.*, *Jeffcoat v. Astrue*, No. 09-CV-5276, 2010 WL 3154344, at *13 (E.D.N.Y. Aug.6, 2010) (remanding where plaintiff's attorney indicated at hearing that he had written to treating physician for records and the ALJ indicated that he would request a report from treating physician, but ALJ's opinion did not address whether request ever actually made or responded to); *Hilsdorf*, 2010 WL 2836374, at *12 (holding, in part, that the ALJ did not discharge his affirmative obligation to obtain records from plaintiff's treating physician, despite his repeated requests for information).

Thus, the ALJ erred in rejecting the opinions of plaintiff's treating sources for presumed inconsistencies or lack of support because the ALJ did not fulfill his obligation to affirmatively develop the record. On remand, the ALJ should seek clarification from Dr. Schwartz on Dr. Schwartz's opinion of "probable rheumatoid arthritis," given the presence of a negative rheumatoid factor. (*See supra* note 22 (a negative rheumatoid factor is not conclusive of an absence of rheumatoid arthritis).) The ALJ should also affirmatively seek out treatment notes, progress notes, or office notes from Dr. Schwartz regarding plaintiff's disability, and clarification of whether there is confirmation for Dr. Zelefsky's radioculopathy diagnosis. *See Clark*, 143 F.3d at 118.

### 3. The ALJ's Consideration of Plaintiff's Medically Determinable Severe Impairments

At all stages of the five-step sequential analysis, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." *Burgin*, 348 F. App'x at 647 (citing 20 C.F.R. § 404.1523) (internal citations omitted). Further, if the ALJ "do[es] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the

disability determination process." *Id.* (citing 20 C.F.R.
§ 416.945(a)(2)).

The ALJ's failure to list all of plaintiff's
impairments at step two and to consider all of plaintiff's
impairments in determining her RFC requires remand.  Here, in
step two of the five-step sequential analysis, the ALJ found
that plaintiff had "medically determinable serve impairments,"
under 20 C.F.R. §§ 404.1520(c) and 416.920(c) of the
regulations.  (Tr. at 26.)  However, the ALJ failed to specify
which of plaintiff's multiple impairments apparent from the
administration record the ALJ considered to be "severe" under
the regulations, individually or in combination.  (*Id.*)  This
was error.

Even if the court assumes that the ALJ considered the
same combination of severe impairments in the instant decision
that he listed in his first decision, dated January 23, 2007,
namely, "disorders of the back; scoliosis; varicose veins, right
leg, status post surgery; and left foot/ankle pain" (Tr. 49), it
is apparent that the ALJ still disregarded several of
plaintiff's impairments documented by her treating physicians.
For example, evidence in the administrative record indicated
that plaintiff received separate diagnoses of lupus, bilateral
carpal tunnel syndrome, rheumatoid arthritis, osteoarthritis,
venous insufficiency, cervical radiculopathy with disc bulges,

cervical, thoracic, and lumbrosacrol myofascitis, lumbrosacrol radiculopathy, and fibroids. (*See* Tr. 189, 192-93, 200, 213, 232-36, 268, 283-84, 289.) None of these impairments were listed, much less discussed, in the January 23, 2007 decision, nor did the ALJ explicitly consider in either the instant decision or the January 23, 2007 decision how these impairments or combination of impairments affected plaintiff's RFC. The ALJ erred by failing to do so. *See, e.g.*, *Burgin*, 348 F. App'x at 647

Moreover, even if, as defendant argues, the ALJ determined, based on Dr. Plotz's expert testimony, that there was "no evidence establishing that plaintiff had rheumatoid arthritis, systemic lupus, osteoarthritis, or any other kind of arthritis" (Def.'s Reply at 7 (citing Tr. 399, 404)), Dr. Plotz did not opine on whether there was any evidence that plaintiff suffered from bilateral carpal tunnel syndrome or from bilateral foot conditions. On the other hand, as plaintiff points out, Dr. Zelefsky diagnosed plaintiff with bilateral carpal tunnel syndrome and plaintiff's treating podiatrists documented plaintiff's bilateral foot condition. (*See* Pl.'s Opp'n at 11-12; *see also* Tr. 214-223, 232-313.) Considering plaintiff's separate diagnoses for these impairments, the ALJ erred by failing to consider the "combined impact of the [medically severe combination of] impairments . . . throughout the

59

disability determination process." *Burgin*, 348 F. App'x at 647-48 (vacating and remanding where the ALJ failed to list all of the plaintiff's impairments when considering the plaintiff's combined list of impairments when determining plaintiff's RFC).

On remand, the ALJ shall list plaintiff's impairments and specifically consider the combined effect of all of the plaintiff's impairments on her ability to perform work at all steps in the sequential analysis. To the extent that the ALJ implicitly addressed each of these impairments when he discounted the opinions of plaintiff's treating physicians, as defendant asserts he did, the ALJ must explicitly make that finding and, as discussed earlier, give good reasons for this decision.

### 3. The ALJ's Evaluation of Plaintiff's Credibility and Subjective Complaints of Pain

#### a. Legal Standard

Plaintiff's statements of pain or other symptoms cannot alone serve as conclusive evidence of disability. *See Francois*, 2010 WL 2506720, at *7 (citing 42 U.S.C. § 423(d)(5)(A)). The regulations therefore create a two-step process to evaluate a claimant's assertions about symptoms such as pain. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ must determine if a claimant has a "medically determinable impairment that could reasonably be expected to

produce the symptoms alleged." *Id.* (citing 20 C.F.R.
§ 404.1529(b)). If an impairment of that nature is present, the
ALJ must then determine "'the extent to which [the claimant's]
symptoms can reasonably be accepted as consistent with the
objective medical evidence and other evidence'" in the
administrative record. *Id.* (quoting 20 C.F.R. § 404.1529(a).
If plaintiff offers "statements about her symptoms that are not
substantiated by objective medical evidence, the ALJ must make a
finding as to the [plaintiff's] credibility." *Alcantara v.
Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citing SSR 96-
7p, 1996 WL 374186, at *1 (July 2, 1996)). Because an ALJ has
"the benefit of directly observing a claimant's demeanor and
other indicia of credibility," his decision to discredit
subjective testimony may not be disturbed on review if his
disability determination is supported by substantial evidence.
*Brown v. Astrue*, No. 08-CV-3653, 2010 WL 2606477, at *6
(E.D.N.Y. June 22, 2010); *see Aponte v. Sec'y, Dep't of Health &
Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the
Secretary's findings are supported by substantial evidence, the
court must uphold the ALJ's decision to discount a claimant's
subjective complaints of pain.") (internal citations omitted).

When a claimant's symptoms indicate "a greater
severity of impairment than can be shown by the objective
medical evidence alone," the ALJ must consider these factors in

making a credibility determination: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); *see also* *Alcantara*, 667 F. Supp. 2d at 277-78.  The ALJ is required to "consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony," taking into account the factors enumerated in 20 C.F.R. § 404.1529(c)(3).  *Alcantara*, 667 F. Supp. 2d at 277 (citing SSR 96-7p, 1996 WL 374186, at *3).

### b. Analysis

The ALJ's failure to properly evaluate plaintiff's subjective complaints of pain warrants remand.  Here, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" to be "disproportionate to the record" and "not entirely credible." (Tr. 30.)  To support his position, the ALJ states that

plaintiff's complaints are "not supported by the medical record, in particular findings on physical examination and the results of diagnostic testing" and cites evidence of "poor effort on testing," a lack of hospitalization or surgical intervention, and ordinary medication without any adverse side effects. (*Id.*) The ALJ also states that plaintiff engages in a "reasonable range of daily living activities," is "independent in self care," can perform "some light chores," and takes walks for exercise. (*Id.*)

As an initial matter, as noted, the ALJ never sets forth which of plaintiff's medical impairments he considered in determining whether those conditions could reasonably be expected to produce the debilitating pain of which plaintiff complains. Furthermore, when evaluating the credibility of plaintiff's subjective allegations of pain pursuant to § 404.1529(c)(3), the court notes that the ALJ seems to mischaracterize the record. For example, the ALJ states that plaintiff had poor effort on testing. However, as the plaintiff argues, alleged poor effort on testing with consultative examiners is consistent with plaintiff's treating physicians' repeated diagnoses of pain in the tested regions. (Pl.'s Opp'n at 14.) Indeed, consulting physician, Dr. Calvino, specifically noted that plaintiff declined performing grip testing in the right hand, an extension, a lateral flexion bilaterally, a

lateral rotation of the neck to the right, and manual muscle testing on the right all "due to pain" and that cervical rotation was limited to 10 degrees to the left "due to pain." (Tr. 238-40.)  Further, when Dr. Park noted that plaintiff refused to test the lumbar spine range of motion during the examination, he did not indicate whether the refusal was due to pain or some other reason.  (Tr. 186.)

        Moreover, contrary to the ALJ's assertion, plaintiff did undergo surgery for pain, namely for her venous insufficiency.  (Tr. 256, 427.)  With regard to her medication, several of plaintiff's treating physicians have documented that several of plaintiff's medications did not alleviate her symptoms.  (*See, e.g.*, Tr. 200, 220-23, 439.)

        Furthermore, plaintiff's testimony does not support the ALJ's finding that plaintiff was able to engage in a "reasonable range of daily living activities," independence in self-care, and light chores.  (Tr. 30.)  To the contrary, plaintiff reported that her household chores are limited to light dusting and sweeping as well as cooking while sitting down with her legs elevated.  (Tr. 147, 384-85.)  With regard to self-care, plaintiff reported that her daughter helps her with grooming, dressing, and showering, as she has difficulty getting dressed by herself.  (Tr. 146-47, 238, 447.)  The fact that plaintiff was able to dress and undress for her examinations

with Drs. Park and Calvino does not mean she was able to do so without difficulty, or that she can do so on a regular basis. Furthermore, plaintiff reported that she goes shopping only once a month, accompanied by her brother, and only leaves the house twice a week, never alone. (Tr. 148-49, 238, 369, 384, 447.) With regard to other daily activities, plaintiff reports socializing with her young nephews, watching television, and reading newspapers, intermittently elevating her feet and laying down due to pain and fatigue. (Tr. 385, 429, 439-40.) While the ALJ "must, of course, assess the credibility of this testimony along with the remainder of the record," on remand, the ALJ shall keep in mind that he "'cannot simply selectively choose evidence in the record that supports his conclusions'. . . [or] mis-characterize a claimant's testimony." *Meadors v. Astrue*, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) (quoting *Gecevic v. Sec'y of Health and Human Servs.*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995)); *see also Hilsdorf*, 2010 WL 2836374, at *17-18 (finding that the mere fact that the plaintiff engaged in activities such as walking two-to-three blocks, shopping for medications occasionally, and driving a car were insufficient to suggest that he "engaged in any of those activities for sustained periods comparable to those required to hold [even] a sedentary job" (internal citations and quotation marks omitted)).

Thus, on remand, the ALJ should specify which of plaintiff's medical impairments he considered in determining whether those conditions could reasonably be expected to produce the debilitating pain of which plaintiff complains and shall consider his finding on plaintiff's subjective complaints consistent with this opinion pursuant to 20 C.F.R. § 404.1529(c)(3). *See Hilsdorf*, 2010 WL 2836374, at * 15 ("[An] ALJ's decision to discount a claimant's subjective complaints of pain will be upheld only when that decision is supported by substantial evidence.") (internal citation and quotation marks omitted); *Vasquez v. Barnhart*, No. 02-CV-6751, 2004 WL 725322, at *11 (E.D.N.Y. Mar. 2, 2004) (because "[a] claimant need not be an invalid to be found disabled under the Social Security Act. . . . [i]f on remand the ALJ again reaches step four of his analysis, he should give proper weight to [plaintiff's] testimony, including consideration of all of the factors identified above as required by SSR 96-7P, and should not base a finding . . . on her ability to undertake essential daily tasks of caring for her family.")

**4.   The ALJ's Reliance on the Vocational Expert's Testimony**

A "vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job."

*Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). There
must be "substantial record evidence to support the assumption
upon which the vocational expert based his opinion." *Dumas v.
Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983); *see also
Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (An
ALJ "may rely on a vocational expert's testimony regarding a
hypothetical as long as the facts of the hypothetical are based
on substantial evidence and accurately reflect the limitations
and capabilities of the claimant involved." (internal citations
omitted)).

Here, plaintiff argues that the ALJ erred by
discounting the vocational expert's testimony. (Pl.'s Opp'n at
22-25.) Specifically, plaintiff argues that the ALJ erred by
finding that plaintiff retained the RFC to perform a full range
of sedentary work and could perform her past relevant work,
where the vocational expert stated, in response to a
hypothetical question, that an individual who could lift up to
five pounds frequently and a maximum of ten pounds, stand and
walk for one to two hours and sit for two to four hours in an
eight hour workday could not perform sedentary work. (*Id.* at
22-23.)

As discussed, the court remands the case to reassess,
*inter alia*, the plaintiff's limitations and capabilities in
light of her combined impairments, not all of which appear to

have been previously considered by the ALJ, a newly developed record, and after considering the weight to accord all of plaintiff's treating physicians. Accordingly, on remand, if re-analysis of plaintiff's claims leads the ALJ to step four or five, the ALJ shall obtain new testimony from a vocational expert on whether, based on substantial evidence in the record and an accurate reflection of plaintiff's limitations and capabilities, plaintiff retains the ability to perform her past relevant work or other work in the national economy. *See, e.g.*, *McDowell v. Comm'r of Soc. Sec*, No. 08-CV-1783, 2010 WL 5026745, at *4 (E.D.N.Y. Dec. 3, 2010) (new vocational expert testimony required on remand where court found error in the ALJ's analysis of plaintiff's limitations and capabilities); *Roth v. Astrue*, No. 08-CV-00436, 2008 WL 5585275, at *25 (D. Conn. Nov. 14, 2008) (new vocational expert testimony required in light of the court's finding that ALJ needed to reassess plaintiff's RFC on remand).

**D.   Analysis: SSD Claim**

In order to be eligible for SSD, plaintiff must demonstrate that she was disabled between April 15, 2003, her amended alleged onset date, and September 30, 2003, her last date insured. *See, e.g.*, *Perez v. Shalala*, 890 F. Supp. 218, 224 & n.3 (S.D.N.Y. 1995). This is the case because, "[i]n order to be eligible for disability insurance benefits, an

applicant must be 'insured for disability insurance benefits.'"
*Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (citing 42
U.S.C. §§ 423(a)(1)(A), 423(c)(1), 20 C.F.R. §§ 404.130,
404.315(a)). For plaintiff to have "disability insured status,"
she must meet the "20/40 requirement," meaning she must be
"insured" for such benefits for at least 20 of the 40 quarters
preceding the month in which the application for benefits is
made. *See* 20 C.F.R. §§ 404.130(a) & (b); *Papp v. Comm'r of Soc.
Sec.*, No. 05-CV-5695, 2006 WL 1000397 at *12 (S.D.N.Y. Apr. 18,
2006). However, "if the claimant can establish a continuous
'period of disability' during which his disability prevented him
from accruing earnings, then that period is excluded from the
20-quarter computation." *Velez v. Barnhart*, No. 03-CV-0778,
2004 WL 1464048, at *3 (S.D.N.Y. May 28, 2004) (citing 20 C.F.R.
§§ 404.130, 404.320(a)).

    As noted by the Appeals Council, the ALJ did not
explicitly adjudicate plaintiff's SSD claim, but only included a
decisional paragraph for the SSI claim. (*See* Tr. 9.) Upon
reviewing the ALJ's decision, however, the Appeals Council
adopted the ALJ's findings and conclusions made in connection
with plaintiff's SSI claim, applied them to plaintiff's SSD
claim, noting that the ALJ referenced pertinent law under the
authority of 20 C.F.R. §§ 404.1520(a) (determining disability
for SSD claims) and 416.920(a) (determining disability for SSI

claims) and evaluated the record as it applies to both Titles II and XVI of the Act.  (*Id.*)  The Appeals Council accordingly found the plaintiff "not disabled" for both the plaintiff's SSI and SSD claims.  (*Id.*)

Defendant argues that plaintiff failed to put forth any evidence prior to May, 2004, and accordingly has failed to demonstrate that she was disabled between her amended alleged onset date and her last date insured.  (Def.'s Mem. at 23.) However, at the hearing, plaintiff's attorney stated that he has medical records beginning from April, 2003.  (Tr. 366-67.)  On remand, the ALJ shall explicitly address plaintiff's SSD claim and, if medical evidence beginning from April, 2003 exists, determine whether plaintiff is eligible for SSD.  *See, e.g.*, *Velez*, 2004 WL 1464048, at *4 (finding application for benefits correctly denied where plaintiff could not show that he was under a disability prior to his last insured date).

### CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

> (1)  Provide a clear and explicit statement of the "good reasons" for the weight given to the opinions of Drs. Desroches, Zelefsky, and Schwartz in accordance

with the guiding factors listed in 20 C.F.R.
§§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6), if he
declines to afford them controlling weight, and
reconcile their RFC determinations with the opinions
of consultative examiners Drs. Park and Calvino, and
non-examining source Dr. Plotz;

(2) Affirmatively seek clarifying information from Drs.
Desroches, Zelefsky, and Schwartz where he found
inconsistencies with the record or disagreements with
the other doctors in the record;

(3) List plaintiff's "severe impairments" in step two and
specifically consider the combined effect of all of
these impairments at all steps in the sequential
analysis;

(4) Clarify his position on plaintiff's bilateral carpal
tunnel syndrome and bilateral foot condition and its
bearing on the disability determination;

(5) Set forth which of plaintiff's medical impairments he
considers in determining whether those conditions
could reasonably be expected to produce the
debilitating pain of which plaintiff complains and
reevaluate plaintiff's subjective complaints
consistent with this opinion pursuant to 20 C.F.R. §
404.1529(c)(3) and *Hilsdorf*, 2010 WL 2836374;

(6)   If re-analysis of plaintiff's claims leads the ALJ to step four or five, obtain new testimony from a vocational expert on whether, based on substantial evidence in the record and an accurate reflection of plaintiff's limitations and capabilities, plaintiff retains the ability to perform her past relevant work or other work in the national economy; and

(7)   Explicitly address plaintiff's SSD claim and determine whether she is eligible for SSD.

Given the passage of time between the ALJ's latest decision and the instant disposition, the court also recommends that the ALJ:

(8)   Inquire upon plaintiff's current medical condition as it relates to plaintiff's SSI and SSD applications; and

(9)   Reassess plaintiff's testimonial credibility, subjective complaints of pain and functional limitations, employability, and disability in light of this opinion, in light of plaintiff's current medical condition, and in light of any newly obtained information relevant to  plaintiff's claims.  *See Lisa v. Sec'y of the  Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (holding that assessments of plaintiff's medical condition, after the ALJ's initial disability determination, may

reveal that plaintiff has "an impairment substantially more severe than was previously diagnosed.").

The Clerk of the Court is respectfully requested to close the case.

**SO ORDERED.**

Dated      May 6, 2011
           Brooklyn, New York

                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York